# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREA GRANT | ) | 3:18-CV-00261 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW SAUL, Commissioner of the | ) | |
| Social Security Administration,[1] | ) | March 18, 2020 |
| *Defendant.* | | |

## MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS [ECF NO. 23] AND DEFENDANT'S MOTION TO AFFIRM [ECF NO. 27]

Kari A. Dooley, United States District Judge:

The Plaintiff, Andrea Grant ("Grant"), brings this administrative appeal pursuant to 42 U.S.C. § 405(g). She appeals the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). Grant moves for judgment on the pleadings and a finding of disability, while the Commissioner moves for an order affirming its decision. For the reasons set forth below, the Commissioner's motion is DENIED and Grant's motion is DENIED as to judgment on the pleadings and a finding of disability, but GRANTED insofar as the Court REMANDS this case to the Commissioner in accordance with the decision below.

**Standard of Review**

A person is "disabled" under the Act if that person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

---

[1] The Plaintiff commenced this action against Nancy A. Berryhill as the Acting Commissioner of Social Security on February 12, 2018. Andrew M. Saul subsequently became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner Saul is automatically substituted for Nancy A. Berryhill as the named defendant. The Clerk of Court is directed to amend the caption in this case accordingly.

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 423(d)(3). In addition, a claimant must establish that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months"; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant is unable to perform her past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of her RFC and her education, age, and work experience. *Id*. §§ 404.1520 (a)(4)(i)-(v); 404.1509. The claimant bears the burden of proof with respect to Step One through Step Four, while the

Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

It is well-settled that a district court will reverse the decision of the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (internal quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The Court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (*per curiam*) (internal quotation marks and citation omitted). Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian*, 708 F.3d at 417.

**Background and Procedural History[2]**

On July 24, 2014, Grant filed an application for DIB pursuant to Title II of the Act. Grant alleged a disability onset date of July 1, 2009 and the ALJ found that Grant's date last insured was September 30, 2013. Grant's application for DIB from July 1, 2009 through September 30, 2013 was denied at both the initial and reconsideration levels. Thereafter, a hearing was held before the ALJ on June 14, 2016. On January 12, 2017, the ALJ issued a written decision denying Grant's application.

In his decision, the ALJ followed the sequential evaluation process for assessing disability claims discussed above. At Step 1, the ALJ determined that Grant had not engaged in substantial gainful activity since her claimed onset date through her date last insured. At Step 2, the ALJ determined that Grant had the following severe impairments through her date last insured: obesity, degenerative disc disease, and a left knee impairment. The ALJ further found that the following impairments, among others, were non-severe: migraine condition, post-kidney transplant condition, and sleep disorder. At Step 3, the ALJ concluded that Grant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Appendix 1. At Step 4, the ALJ concluded that Grant had an RFC to perform light work, subject to certain specified limitations. The ALJ also found that Grant had no past relevant work. Finally, at Step 5, the ALJ found that there were jobs that existed in significant numbers in the national economy that Grant could have performed. Accordingly, the ALJ found that Grant was not disabled within the meaning of the Act during the period at issue.

On December 20, 2017, the Appeals Council denied Grant's request for review. This appeal followed.

---

[2] The Court has reviewed the medical evidence of record and does not, in light of the Court's determination to remand this matter to the Commissioner, herein detail the Plaintiff's medical ailments or treatment history.

**Discussion**

On appeal, Grant challenges the Commissioner's denial of DIB, arguing that the ALJ erred at Step 2, by classifying her migraine condition, post-kidney transplant condition, and sleep disorder as non-severe impairments; by failing to consider those impairments at Step 3 of the disability analysis and in determining her RFC, and by assigning improper weight to two of her treating physicians' opinions and the state agency physician's opinion. In response, the Commissioner argues that the ALJ's conclusions and findings are supported by substantial evidence in the record. Grant's claims are addressed below *seriatim*.

**Grant's Non-Severe Impairments**

A claimant seeking social security benefits must bear the burden of showing that she has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). "The severity regulation requires the claimant to show that [she] has an impairment or combination of impairments which significantly limits the abilities and aptitudes necessary to do most jobs." *Id.* at 146 (internal quotation marks and citations omitted). It is the claimant's burden to provide "medical evidence which demonstrates the severity of her condition." *Merancy v. Astrue*, No. 3:10-cv-1982 (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).

*Sleep Disorder*

The ALJ found that Grant's sleep disorder was non-severe because "[t]he medical evidence for the period at issue fails to reflect that during the period at issue when considered by itself or in combination with the claimant's other impairments the claimant's sleep impairment resulted in more than minimal ongoing limitation." Tr. at 21. Specifically, the ALJ relied on Grant's score of

5 out of 24 on the Epworth Sleepiness Scale ("ESS"),[3] which Dr. Francoise Roux, the evaluating physician, noted was "not indicative of perceived hypersomnia." *Id*. at 421.

Grant argues that the ALJ misunderstood her October 2009 sleep study. She asserts that the "actual sleep study" is done after the ESS test and that it showed that she suffered from "increased upper airway resistance syndrome with snoring, sleep fragmentation, and elevated Breathing Disturbance Index." *Id*. Thus, Grant claims that the ALJ had no basis for determining whether the sleep disorder was severe or not.

The Court disagrees. First, as noted above, it is Grant's burden to show that her sleep disorder significantly limited her "ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). But, Grant simply restates a portion of her October 2009 sleep study results without explaining whether or how those results indicate that her sleep disorder significantly limited her ability to work. Moreover, in determining that the sleep disorder was not severe, the ALJ relied upon the October 2009 sleep study wherein Dr. Roux specifically states that the results of Grant's ESS were "not indicative of perceived hypersomnia." Tr. at 421. In other words, Grant's ESS test result indicated that she did not suffer from abnormal daytime sleepiness to such an extent as to significantly limit her ability to work. *See About the ESS*, THE EPWORTH SLEEPINESS SCALE, https://epworthsleepinessscale.com/about-the-ess/ (last visited March 18, 2020) (the ESS measures a patient's daytime sleepiness). Notably, the sleep study further reveals that "[t]here were no clinically significant outright apneas or hypopneas. There was no movement disorder. RECOMMENDATIONS: Weight loss is the mainstay of therapy. She should be referred to ENT to be evaluated for upper airway anatomical abnormality. In the absence of upper airway

---

[3] The ESS is a self-administered questionnaire intended to assess a patient's daytime sleepiness. *See About the ESS*, THE EPWORTH SLEEPINESS SCALE, https://epworthsleepinessscale.com/about-the-ess/ (last visited March 18, 2020). An ESS score of 0–5 may be interpreted as "Lower Normal Daytime Sleepiness." *Id*.

anatomical abnormality, she would benefit from a mandibular advancement device." Tr. at 421. Thus, although Dr. Roux found that Grant suffered from several sleep-related complications, the ALJ's finding that her sleep disorder was non-severe is supported by substantial evidence.[4]

### *Post-Kidney Transplant Condition*

The ALJ also found that the medical evidence did not reflect that Grant's post-kidney transplant condition resulted in more than minimal ongoing limitations and was, therefore, non-severe. *Id*. at 21. In so finding, the ALJ noted that Grant had a medical history of nephropathy due to her kidney problems, but that she had been doing well post-kidney transplant and that there were "no reports of further treatment for this impairment in the evidence of record." *Id*. The ALJ specifically cited to Dr. Peter Ellis' assessment on September 4, 2014 that Grant, "post kidney transplant," was "[d]oing well." *See id*. at 612.

Grant argues that the ALJ erred in two ways, first by improperly seizing upon one statement in a report from almost a year after the period at issue, which also noted that Grant suffered from "body pain" and had "difficulty with her memory." *Id*. at 610. Second, Grant asserts that, in contrast to the ALJ's indication that there are no reports of further treatment for Grant's transplant condition, there are multiple records documenting Grant's follow-up appointments with the Kidney and Pancreas Transplant Program at Yale. Accordingly, Grant claims that the ALJ had no basis for determining whether her transplant condition was severe or not.

The Court agrees. Dr. Ellis' 2014 assessment of Grant's condition post-kidney transplant does not, by itself, establish that Grant's transplant condition was non-severe during the period at issue. And the ALJ's statement that there are "no reports of further treatment for this impairment in the evidence of record" is clearly wrong as a factual matter. In combination, these two errors,

---

[4] As discussed *infra.*, the ALJ was required to consider these complications and this non-severe impairment when formulating the RFC, which he did not do.

warrant a remand to determine whether this impairment is severe, *Howarth v. Berryhill*, No. 3:16-cv-1844 (JCH), 2017 WL 6527432, at *16 (D. Conn. Dec. 21, 2017) (noting that remand is appropriate when the ALJ misreads the record and the ultimate determination is not otherwise supported by substantial evidence), and if it is determined to be severe, whether it meets the Appendix 1 Listings.[5]

### Migraine Condition

Although noting that Grant had a history of migraines, the ALJ found that the evidence for the period at issue failed to reflect that Grant's migraine condition resulted in more than a minimal ongoing limitation. Tr. at 21. The ALJ specifically noted that "the evidence also states that the migraines were under good control." *Id.* (citing Tr. at 360). Thus, the ALJ found that Grant's migraine condition was non-severe.

Grant argues that the ALJ erred by focusing on one vague treatment note from February 2012 stating that Grant's migraine condition was "under good control." *Id.* at 634. She also argues that the ALJ erred by disregarding other evidence, including Dr. Steven Novella's treating source statement[6] and her hearing testimony, indicating the severity of her migraine condition. The Commissioner, on the other hand, argues that the evidence relating to Grant's migraine condition

---

[5] Grant has shown that she took anti-rejection medication and that she regularly followed-up with medical professionals regarding that medication. While it may well be that the need for, and attendance at, regular appointments to monitor a condition, does not, of itself, render that condition severe, *cf. Torres v. Astrue*, 550 F. Supp. 2d 404, 410–11 (W.D.N.Y. 2008) (finding that the plaintiff's condition was not severe, in part, because plaintiff benefitted from "regular psychiatric and pharmacologic therapy"), given the ALJ's erroneous statement about the content of the record, it does not appear that he considered these records in making the Step 2 assessment. In addition, the record reflects one potentially significant event related to her status as a kidney transplant recipient. During a December 6, 2013 post-kidney transplant follow-up visit, Dr. Formica became concerned about a rash under Grant's right breast. Tr. at 341–42. He noted that Grant was given steroids by "plastics," which reduced redness, but failed to alleviate pain or itching. *Id.* at 342. As a result of the visit, it appears that Dr. Formica prescribed Grant with a new medication to address what he deemed to be "possibly superinfected shingles." *Id.* Again, the Court does not opine as to whether and how this record will impact the assessment, but it does not appear it was considered by the ALJ in the first instance, necessitating, as discussed above, a remand.

[6] Dr. Novella was the Plaintiff's treating neurologist who treated the Plaintiff for, among other things, her migraine headaches.

fails to show that it resulted in more than minimal work-related limitations. For the reasons below, the Court finds that the ALJ's decision that Grant's migraine condition was non-severe is supported by substantial evidence.

At Grant's September 2010 visit, Dr. Novella indicated that Grant had "been getting [migraines] several times per week, lasting about a half hour." *Id*. at 629. As a result of that visit, Dr. Novella prescribed Lyrica for "symptomatic treatment of her pain and headache." *Id*. at 631. Then, in a follow-up visit in March 2011, Dr. Novella noted that "[Grant] was having headaches, but *these resolved* when her blood pressure medication was changed to control her hypertension," and that "[p]ositive symptoms *have responded well* to Lyrica . . . ." *Id*. at 625–27 (emphasis added).

Thereafter, in a February 2012 visit, Dr. Novella noted that "[o]verall [Grant's chronic headaches] *have been improved. She has not had many headache[s]—less than one per month*." *Id*. at 633 (emphasis added). With respect to her medications, Dr. Novella noted, "[Grant] takes Lyrica 100mg BID and tolerates that well. She takes Tylenol for abortive therapy *with good effect*. She has *occasional nausea and has Reglan available but usually does not feel that she needs it*." *Id*. (emphasis added). Accordingly, Dr. Novella concluded, "[Grant] has a history of migraine[s], *under good control* . . . . She is responding well to Lyrica . . . ." *Id*. at 634 (emphasis added). Then, in a June 2013 visit, Dr. Novella noted, "[Grant] continues to have headaches, mostly perimenstrual. She essentially has one headache before and after her period, but lasting a few days. *She denies any nausea*. She take[s] Tylenol for abortive therapy with little benefit . . . . She remains on Lyrica with some benefit." *Id*. at 638 (emphasis added). Dr. Novella concluded, "[Grant's] headaches are *stable*." *Id*. at 639 (emphasis added).

After Grant's date last insured, Grant continued to have follow-up visits with Dr. Novella regarding her headaches. These records tell a similar story. Indeed, Dr. Novella's treatment records

reveal that Grant "continues to have headaches, mostly perimenstrual," Dr. Novella also notes that Grant "*denies any nausea*" and that "[Grant's] headaches are *stable*," "[h]er headaches *are improved*," and "[s]he *rarely* has headaches now." *Id*. at 643–45, 709 (emphasis added). Thus, there is plenty of support within the medical record for the ALJ's finding that Grant's migraine condition was non-severe.

In addition, Dr. Novella's source statement does not necessarily alter the analysis. First, Dr. Novella's source statement explicitly states, "[o]ur physicians do not complete impairment questionnaires; you will need to obtain an independent reviewer." *Id*. at 702. Accordingly, the statement does not specifically shed light on Grant's work limitations related to her migraine condition. Additionally, Dr. Novella's source statement is largely consistent with his treatment notes. It reiterates that Grant had a migraine condition and that she suffered from headaches on occasion. *Id*. at 704 (indicating that Grant's headaches occur once a month for a few days). Similar to Grant's treatment records, the submissions also indicate that Grant may have experienced nausea and difficulty concentrating. *Id*. Absent any assessment that the condition actually impacted Grant's ability to work, the source statement does not establish that the ALJ erred in his determination that the migraine condition was non-severe.

Lastly, Grant's hearing testimony does not undermine the substantial evidence supporting the ALJ's finding. Although Grant testified that her migraine condition impacted her ability to work, *see id*. at 69 (Grant testifying that her headaches occurred once a week for multiple days and that she would have to be in a dark room without noise to alleviate symptoms of nausea and vomiting), the ALJ was not required to credit her testimony. *See* 20 C.F.R. § 404.1508 (effective to Mar. 26, 2017) ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms"),

*amended by* 20 C.F.R. § 404.1521 (effective Mar. 27, 2017) ("[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source. We will not use your statement of symptoms . . . to establish the existence of an impairment[]."). And her treatment records, which expressly contradicted her testimony, provide substantial evidence to support the ALJ's conclusion that Grant's migraine condition was non-severe. *See*, *e.g.*, Tr. at 638 ("[Grant] denies any nausea."); *cf. Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (summary order) (finding that the ALJ reasonably relied on medical testimony and treatment notes in rejecting plaintiff's testimony as to the severity of plaintiff's impairment in the context of the ALJ's assessment of plaintiff's credibility).

**The ALJ's Consideration of the Non-Severe Impairments in the Remaining Steps**

Because the migraine condition and the sleep disorder were considered non-severe, the ALJ was not required to determine whether they met the applicable Listings.[7] And although Grant argues that her migraine condition not only should have been found to be severe, but that it would also meet an applicable Listing, the Court need not address this argument because the Court has determined that the ALJ did not err in finding that the migraine condition was non-severe.

Notwithstanding, the ALJ was still required to consider these impairments in the subsequent steps and when fashioning Grant's RFC. "[O]nce a 'severe' impairment has been found, the ALJ must base his RFC on all the relevant medical evidence, including both 'severe' and 'non-severe' impairments . . . . The Regulations state that '[w]e will consider all of your impairments of which we are aware, including your medically determinable impairments that are

---

[7] As indicated above, whether the post-kidney transplant condition is deemed severe must be revisited on remand. If it is determined to be severe, whether it meets the Listings must also be examined. If the ALJ determines that it is non-severe, then it must be considered when formulating Grant's RFC. Because the Court is of the view that the ALJ also failed to consider the post-kidney transplant condition in the RFC, it is discussed in this section notwithstanding the Court's earlier determination.

not "severe" . . . when we assess your [RFC].'" *Lofton v. Colvin*, No. 3:13-cv-528 (JBA), 2015 WL 2367692, at *21 (D. Conn. May 13, 2015) (internal citations omitted) (citing 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2), 416.920(e)). Grant asserts that the ALJ did not consider her non-severe impairments in determining her RFC. The Court agrees.

On this issue, the Commissioner first argues that the discussion by the ALJ regarding these impairments at Step 2 "belies Plaintiff's argument that the ALJ did not fully consider their impact." (ECF No. 27-1 at p. 13). However, at Step 2, the claimant must establish her impairment through "medical evidence" and "[n]o symptoms or combination of symptoms can be the basis for a finding of disability unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable impairment." *Merancy v. Astrue*, No. 3:10-cv-1982 (MRK) (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012). The RFC, on the other hand, requires the ALJ to consider *all* evidence of record, medical and non-medical, testimonial and documentary. *See* 20 C.F.R. § 220.120(a) ("[RFC] is an assessment based upon all of the relevant evidence."). The Commissioner cannot therefore rely upon the Step 2 analysis to rehabilitate an inadequate RFC analysis because the ALJ is required to consider more evidence in fashioning the RFC. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) ("[T]he Commissioner's procedures do not permit the ALJ to simply rely on his finding of non-severity as a substitute for a proper RFC analysis.") (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *4 (July 2, 1996)).

The Commissioner further relies upon the ALJ's boilerplate assertion that "[i]n making this finding [regarding Grant's RFC], the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 96-4p." Tr. at 23. It is well-settled that, although an ALJ's decision need not be perfect, a boilerplate recitation

12

that the entire record has been considered does not satisfy his drafting obligations if the ALJ does not otherwise provide reasons for his determination. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("[r]emand for further findings or a clearer explanation" is appropriate when a court cannot "fathom the ALJ's rationale in relation to evidence in the record . . . .") (internal quotation marks omitted); *Abdulsalam v. Comm'r of Soc. Sec.*, No. 5:12-cv-1631 (MAD), 2014 WL 420465, at *8 (N.D.N.Y. Feb. 4, 2014) (noting that "the use of such boilerplate is conclusory and unhelpful," but that the ALJ's determination regarding Plaintiff's credibility was otherwise adequately supported).

Upon review of the ALJ's RFC analysis, there is little to no indication that the ALJ considered Grant's non-severe impairments. To start, the analysis at Step 4 and the explanation for the RFC is completely silent on Plaintiff's sleep disorder or her post-kidney transplant condition. Both of these conditions purportedly impact Plaintiff's alertness, memory, or sensitivity to certain environs. Given that the medical records are replete with reference to and treatment for these conditions, even if found to be non-severe, the extent to which they would combine to limit her work capacity must be considered. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your [RFC]."). Because these conditions are not so much as mentioned, a remand is required for reconsideration of the Plaintiff's RFC. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order) ("[E]ven if this Court concluded that substantial evidence supports the ALJ's finding that [claimant's] mental impairment was nonsevere, it would still be necessary to remand this case for further consideration because the ALJ failed to account [for limitations resulting from the non-severe impairment] when determining [the claimant's] RFC.").

In addition, with respect to the migraine condition, it was only discussed in the context of deciding how much weight to give Dr. Novella's opinion. Once the ALJ decided to afford "little weight" to Dr. Novella's opinion, the ALJ did not further assess or consider the migraine condition at all in fashioning the RFC. Indeed, the RFC contains no mental limitations at all, and no explanation for that despite the ALJ's finding that Grant suffers from a sleep disorder, a post-kidney transplant condition and migraine headaches each of which affect her mental acuity to some extent. In short, these conditions do not appear to have been accounted for and remand is therefore required.[8] *See also MacDonald v. Comm'r of Soc. Sec.*, No. 17-cv-921, 2019 WL 3067275, at *3–4 (W.D.N.Y. July 11, 2019) (remanding to ALJ for consideration of plaintiff's limitations from an impairment, whether severe or not, when formulating plaintiff's RFC); *Benoit v. Saul*, No. 3:19-cv-00443 (WIG), 2019 WL 6001596, at *7 (D. Conn. Nov. 14, 2019) (same); *Burgos v. Astrue*, No. 309-cv-1216 (VLB), 2010 WL 3829108, at *5 (D. Conn. Sept. 22, 2010) (remanding to ALJ to "specifically identify all of the Plaintiff's impairments and evaluate their combined impact on her ability to work.").

### The Medical Opinion Evidence

Grant also challenges the ALJ's determination to give "little weight" to the opinions of her treating physicians Dr. Novella and Dr. Robbins[9] and his decision to give "great weight" to the opinion of the consulting physician, Dr. Kuslis, following a records review. The Court considers

---

[8] This is particularly problematic because the vocational expert testified that the Plaintiff would not be able to work if she had impairments that would take her "off task" 11% of the time. Tr. at 77–78. Given the purported impact of these impairments on Plaintiff's concentration, memory, alertness, etc., the failure to include them raises significant questions as to the ALJ's ultimate determination that the Plaintiff was not disabled during the relevant time period.
[9] Dr. Robbins, who treated the Plaintiff for her ongoing back pain, provided an opinion that the Plaintiff suffered from constant back pain that significantly restricted her ability to stand, sit, lift or otherwise function in a competitive work environment. Tr. 767–71. He treated the Plaintiff during the time period at issue and his records include detailed notations as to her complaints and his treatment. *See, e.g.,* Tr. 489–529.

the ALJ's determinations regarding Drs. Novella and Robbins' opinions under the "treating physician rule":

> Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts . . . .
>
> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks, citations and brackets omitted).

Here, the ALJ gave "little weight" to both Drs. Novella and Robbins' opinions, in part, because it was "unclear when the limits noted actually commenced." Tr. at 25. The ALJ further found that the opinions were "not 'not inconsistent'" with the treatment records. *Id*. But the ALJ does not cite to any portion of the record to support this wholly conclusory statement and does not otherwise explain his decision to afford little weight to the opinions of Drs. Novella and Robbins. As indicated, among the ALJ's obligations is the duty to explain his reasoning "in making the findings on which his ultimate decision rests, and in doing so must address all pertinent evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter

opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Keeton v. Commissioner of Social Sec.*, 583 Fed. App'x 515, 528 (6th Cir. 2014) ("[W]ithout more explanation for the rejection of [the physician's] opinion and a more accurate characterization of the record, this panel cannot find that the ALJ's rejection of [the] opinion was proper and supported by substantial evidence.").

In addition, the ambiguity as to whether the opinions covered the time period at issue is not a basis upon which to assign the opinions "little weight." Rather, the ALJ must first determine whether the opinions are retrospective to the time period at issue before assigning weight to them because "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence. . . ." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003). This is the type of uncertainty that creates a "gap in the record" which the ALJ must address. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."). Indeed, an ALJ must seek additional evidence or clarification when the "report from claimant's medical source contains a conflict *or ambiguity* that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (emphasis added) (internal quotation marks and citations omitted). The ALJ's failures to either adequately explain his decision or seek clarification from Drs. Novella and Robbins as to the time period covered by their opinions require a remand of this matter for rehearing and reconsideration.

On remand, the ALJ must determine whether both physicians' opinions apply to the period at issue in order to properly determine what weight to give them. *See Campbell v. Barnhart*, 178

F. Supp. 2d 123, 137 (D. Conn. 2001) (remanding to ALJ, in part, to clarify the basis of a treating physician's retrospective opinion in order to determine the appropriate weight to give the opinion). And if the ALJ again determines that the opinions should not be afforded controlling weight, he must provide his reasons for doing so consistent with the regulations set forth above.

The ALJ's reconsideration of the treating physicians' opinions may also impact the ALJ's assessment of the consulting physician's opinion. While "the ALJ is entitled to give the opinions of non-examining sources more weight than those of treating or examining sources where there is record evidence to support such a determination," *West v. Berryhill*, No. 3:17-cv-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019); *see also Worthy v. Berryhill*, No. 3:15-cv-1762 (SRU), 2017 WL 1138128, at *6 (D. Conn. Mar. 27, 2017) ("Social Security regulations . . . 'permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record.'") (quoting *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)), "the ALJ may not credit a non-examining physician's opinion over that of a treating physician's where the non-examining physician's opinion considered less than the full record and the subsequent medical evidence may have altered the opinion." *West*, 2019 WL 211138, at *5. Here, Dr. Kuslis considered less than the full record as both Dr. Novella and Dr. Robbins submitted their opinions about a year after Dr. Kuslis provided her opinion. Additionally, even though the ALJ determined that "subsequently received evidence is consistent with [Dr. Kuslis'] assessment," Tr. at 25, that determination may change upon the ALJ's reconsideration of Drs. Novella and Robbins' opinions. If those opinions are deemed retrospective to the period at issue and the ALJ affords them greater weight than he originally afforded them, Dr. Kuslis' assessment may no longer be consistent with the subsequently received evidence.

**Conclusion**

For the foregoing reasons, the Commissioner's motion is DENIED and Grant's motion is DENIED as to judgment on the pleadings and a finding of disability, but GRANTED insofar as, pursuant to Sentence Four of 42 U.S.C. § 405(g), the Court REMANDS this matter to the Commissioner for rehearing and reconsideration. Specifically, the Commissioner shall reconsider whether the Plaintiff's post-kidney transplant condition is severe or non-severe, and if severe, shall determine whether it meets the Appendix 1 Listings. The Commissioner shall reconsider Plaintiff's RFC, considering all of her impairments, severe and non-severe, and determine anew, whether she was disabled during the period at issue. In connection with the Commissioner's reconsideration of the Plaintiff's RFC, the Commissioner is also directed to inquire as to the retrospective nature of Drs. Novella and Robbins' opinions in order to determine the appropriate weight to give their opinions and to determine whether appropriate weight was given to Dr. Kuslis' opinion in light of that determination.

Judgment in favor of the Plaintiff shall enter in accordance herewith. If a subsequent appeal is filed from the determination of the Commissioner on remand, that appeal should be assigned directly to the undersigned.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of March 2020.

    */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE